# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN BRISENO,<br><br>        Petitioner,<br><br>  v.<br><br>JAMES J. WALKER,<br><br>        Respondent. | 1:09-CV-01419 LJO JMD HC<br><br>FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br><br>OBJECTIONS DUE WITHIN THIRTY (30) DAYS |

Adrian Briseno (hereinafter "Petitioner") is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a December 7, 2006, conviction. A jury in the Madera County Superior Court found Petitioner guilty of first degree murder (Cal. Penal Code § 187(a)), attempted first degree murder (Cal. Penal Code §§ 187(a), 664), and assault with a firearm (Cal. Penal Code § 245(a)(2)), The jury further found true the following allegations: Petitioner personally used a firearm causing great bodily injury and death (Cal. Penal Code §§ 12022.53(b)-(d) and 12022.5(a)(1)); Petitioner committed the murder while a member, and to further the activities, of a criminal street gang (Cal. Penal Code § 190.2(a)(22)); and Petitioner committed the substantive offenses to benefit a criminal street gang (Cal. Penal Code § 186.22(b)(1)). The trial court imposed a sentence of life imprisonment without the possibility of parole and a twenty-five years-to-life enhancement for the murder conviction. The trial court imposed a consecutive sentence of life with the possibility of parole plus a twenty-five years-to-life enhancement for the attempted murder conviction. The trial court imposed additional prison terms and sentence enhancements that were stayed.

On October 9, 2007, Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District. (Lod. Doc. 1.) The California Court of Appeal issued a reasoned opinion on June 6, 2008, affirming the conviction and modifying the sentence by striking and staying specific sentence enhancements. (*See* Lod. Doc. 4.) Petitioner filed a petition for review with the California Supreme Court, which the state high court denied on September 10, 2008. (Lod. Doc. 6.)

On July 21, 2009, Petitioner filed the instant federal petition for writ of habeas corpus.

On December 8, 2009, Respondent filed an answer to the petition.

## **FACTUAL BACKGROUND**[1]

### **I. The Shooting**

Jaime Maciel testified that on the evening of December 27, 2004, he left a party and walked to the nearby M & M Market (the market) with appellant, Francisco Espejo and Jose Mendoza. At that time, both appellant and Jaime were Norteno gang members.[2] Jaime saw two young men, identified at trial as Roberto and Luis, standing outside the market, pumping gasoline into a car. A woman holding a baby was standing outside the car and there appeared to be someone sitting in the car's back seat. Jaime knew that Luis and Roberto were Sureno gang members. He recognized Luis, because they had spent time together in a juvenile detention facility. Jaime, appellant, Francisco and Jose went into the market and purchased some beer. As they were leaving the market, they walked past Roberto and Luis. Either Luis or Roberto said something to the effect of, "What are you looking at?" Luis behaved as if he wanted to fight by approaching Jaime and appellant and saying things like "F-U." Meanwhile, Francisco and Jose kept on walking, stopping at a corner near a telephone booth. Appellant pulled out a handgun and pointed it at Roberto. Roberto apologized to appellant and said that he "didn't mean to come at [appellant] sideways." Roberto said something about being with his family and asked appellant not to shoot. The woman said something like, "Please don't. I got my kid." Jaime repeatedly said to appellant, "Don't do it," because Roberto had his family present. Luis said to appellant that he knew Jaime. Appellant asked Jaime, "Do you know this fool?" Jaime replied, "No, I don't know this guy." Jaime denied knowing Luis because he was frightened and did not want appellant "to look at me like a wrong way." Appellant fired the gun at Roberto and Roberto fell to the ground. Jaime ran away. Jaime heard several more gunshots as he ran. Jaime never saw Roberto or Luis with a weapon. Jaime ran a few blocks to a residence located on C Street in which Ralph

---

[1] These facts are derived from the California Court of Appeal's opinion issued on June 6, 2008. (*See* Lod. Doc. 4.) Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).

[2] It was stipulated that appellant was an active member of a criminal street gang on the date of the charged crimes and that the charged crimes were committed to benefit such a gang. A gang expert, Madera Police Detective Jason Dilbeck, testified that VNSM is a subset of the Nortenos with about 40 members. The Norteno and Sureno gangs are at war with each other and have been so for a long time.

Salinas lived (Ralph's house).[3] Francisco and Jose were already there. Appellant arrived a few minutes later. Appellant said to Jaime, "We don't know nothing. We didn't see nothing. We don't know." Jaime said, "I don't know nothing." Also, Jaime said, "I'm with you, dude." Appellant told Jaime "that he went back and shot Roberto Torres again." Jaime said, "All right. That's cool." Jaime remained at Ralph's house for about five minutes and then he telephoned his mother, who came and picked up Francisco, Jose and him. Appellant remained at Ralph's house. [4]FN5

Luis testified that in December 2004 he was a Sureno gang member and Roberto was a former Sureno gang member. Luis and Roberto were at the market buying gasoline for Roberto's car when a group of five or six males arrived on foot. Roberto's wife and child and Luis's girlfriend were in the car. One of the males, who Luis identified at trial as appellant, went inside the market. Appellant exited the market and the group of males began walking as if they were leaving the area. Appellant looked toward the car and repeatedly said, "What's up, scrap?" Although the use of the word "scrap" is a disrespectful term toward Sureno gang members, Luis pretended he did not hear the remark. Appellant repeated his question and put his hand underneath his coat. Appellant approached the front of the car. Luis said, "What's up?" Luis took a few steps forward toward appellant because he thought that his family was being threatened. Appellant pulled out a gun. Luis surrendered. Luis said to appellant, "You win," and "We are with our family." A male, who was stipulated at trial to be Jaime, approached appellant. Jaime said, "Hey, let's go. Let's go." Luis recognized Jaime and asked him to tell appellant, "to calm down. I know you." Appellant asked Jaime if he knew Luis; Jaime denied knowing him. Appellant said, "[Y]ou scraps always disrespect me when I'm with my mom." Appellant told the group of males he had arrived with to leave. Jaime left appellant and joined the rest of the males, who were standing by a pay telephone. Thinking that appellant also was leaving, Luis resumed pumping gas and Roberto walked to the driver's door of the car. Appellant started shooting. Luis saw Roberto fall to the ground. Luis ducked and looked at appellant. Appellant shot Luis in his left thigh. Luis started running. Appellant shot him again in the left thigh and then shot him in the right elbow. Luis fell, got up and ran toward the market. The market's front glass door shattered. Luis threw himself onto the ground and crawled into the market. Luis heard a total of seven or eight gunshots.

Rachel Rodriguez is Luis's girlfriend. Rachel testified that she was sitting in the back seat of Roberto's car at the market when she saw a group of about six males arrive at the market. Roberto stood by the trunk of the car, which was open. Luis went to the passenger door, near the gas tank. A male, who Rachel identified at trial as appellant, and a male companion approached the front of Roberto's car. Appellant repeatedly said something like, "What's up? How are you, scrap?" The other males in the group were standing by a pay telephone near the market. Luis said something like, "What's up," and took a few steps toward appellant. Rachel saw that appellant was holding something in his right hand. Rachel told Luis, "I think he has something." Roberto's girlfriend, Fabiola Daza, said to appellant something like, "We have our family. I have my son. Just leave us." Luis said, "You win. You win." Roberto may have said that he did not want any problems. Luis said to appellant's companion, "You know me." Appellant asked the companion if this was true; the companion

---

[3] Ralph Salinas, Yiliana Martinez and Valerie Salinas all live at this residence. To enhance readability, it will be referred to as Ralph's house.

[4] Jaime testified that the shooting caused him to decide he wanted to give up the gang lifestyle. However, he continued to carry guns and associate with Nortenos. Almost a year after the shooting he was in a vehicle with other Nortenos and the police found a rifle on the vehicle's rear passenger seat. Jaime and the other people in the car pled guilty to felony possession of a firearm to benefit a gang. Jaime did not receive any special treatment.

responded negatively. The companion twice said to appellant, "Let's go." Rachel saw something in appellant's hand that looked like a gun. Appellant waved his hand back and forth. Rachel heard a gunshot and ducked. When she looked up, she saw appellant standing near the place where Roberto had been standing. Appellant was pointing a gun toward the market. Rachel saw Luis running toward the market and saw the market's glass door shatter. Rachel got out of the car and saw Roberto on the ground. Appellant walked to a position north of Roberto's head and pointed the gun at Roberto. Rachel assumed that appellant fired the gun at Roberto, but she did not remember hearing a gunshot. She went into the market to help Luis. She and Luis exited the store to help Roberto, who was lying on the ground.

Fabiola testified that she was in the back seat of the car with her child and Rachel. She saw five or six males arrive at the market. Roberto and Luis exchanged eye contact with the group of males. Luis said, "What are you guys looking at?" One of the males, who Fabiola identified at trial as appellant, said, "What?" Luis replied, "What?" Luis and appellant argued. Fabiola got out of the car and told Roberto not to start anything because their baby was present. Roberto replied, "I know." Roberto told appellant that his family was present and he did not want any trouble. Appellant turned as if to leave, then turned back toward Roberto and said something about having been disrespected when his family was present. Appellant put his hand inside his jacket and told the group of males to leave. Everyone left but one male companion, who repeatedly urged appellant to go. Appellant replied, "No. Just leave." Luis said to appellant's companion that he knew him. Appellant asked the companion if he knew "these fools." The companion put his head down and replied that he did not. Appellant told the companion to leave and said that he would catch up. Roberto began moving. Fabiola saw a gun in appellant's hand and heard a gunshot. She ducked and saw Roberto duck. She heard a second gunshot and saw Roberto fall to the ground. Fabiola testified that she saw appellant shoot Roberto. Fabiola heard a third gunshot and ducked, covering her baby. She looked up and saw appellant shooting at Luis, who was running toward the market. Then she saw appellant run away down B Street.

It was stipulated the market's employees heard gunshots and ducked. As a result, they did not observe any of the parties and could not identify anyone involved in the incident.

Jaime's mother, Carol Armijo, testified that she picked up Jaime, Jose and Francisco from Ralph's house shortly after 10:00 p.m. that evening.

Yiliana Martinez testified that she drove by the market on the evening of the shooting. Valerie Salinas was in the car with her. Yiliana saw police cars and a bunch of people at the market. She drove home. When she arrived, Jaime and appellant were in the front yard; other people were inside the house. Jaime, Jose and Francisco left in a white car driven by Jaime's mother. Appellant asked Yiliana to drive him home. During the drive, appellant asked her what happened at the market. After she told him what she saw, he became nervous and quieter than normal.

Valerie testified that she and Yiliana drove by the market and then drove home. She did not recall who was at Ralph's house when they arrived. She was confused when she told a police detective that appellant, Jaime, Jose and Francisco were at Ralph's house when she arrived. Madera Police Detective David Herspring testified that he interviewed Valerie. She told him that Yiliana and she drove by the market after the shooting and then drove home, where they found appellant, Jaime, Francisco and Jose.

## II. The Investigation

Madera Police Officer Daniel Foss was dispatched to the market at approximately 8:10 p.m. Upon arrival, he found Roberto on the ground near a gas pump. Roberto did not have a pulse. Luis ran up and pleaded with Foss to help

Roberto. Luis told Foss that he had been shot. Foss determined that Luis had an injury to his right elbow and left thigh. Foss took photographs of the crime scene. The market's glass front door was broken by a gunshot or gunshots. An ice cream cooler inside the store near the cash register had a bullet hole in it. A spent bullet was recovered from the cooler. Eight spent .40-caliber shell casings and some bullet fragments were recovered from the crime scene. Fresno Police Officer Michael Powell concluded from the groupings of the shell casings that the shooter fired from two different locations.

An autopsy was performed on Roberto. He suffered three gunshot wounds. A fatal gunshot wound entered the right side of Roberto's head. A potentially fatal gunshot wound entered Roberto's left shoulder and penetrated a portion of his left lung. A gunshot wound grazed Roberto's upper back.

Luis was taken to the hospital and treated for gunshot wounds. While there, he was interviewed by a police officer. Luis told the officer that he heard appellant say, "VNSM," which he knew was a reference to "a northern gang." Also, Luis told the officer that the shooter had a tattoo on the left side of his neck. Appellant has a tattoo on the right side of his neck.

Detective Herspring was designated as the lead investigator. He opined that, based on the crime scene diagram and the location of the spent shell casings, the shooter began shooting while at the front end of Roberto's car and then moved around the passenger side of the vehicle toward the front of the market where he continued shooting toward the front of the store.

Luis, Rachel and Fabiola each identified Jaime from a photographic lineup as appellant's companion.

On January 13, 2005, Detective Herspring interviewed Jaime. After initially lying to the detective, Jaime ultimately admitted being present and identified appellant as the shooter.

After appellant's arrest, Luis, Rachel and Fabiola were shown a photographic lineup consisting of six photographs; appellant's photograph was placed in the number two position (People's Exhibit 33). Jail staff created the photographic lineup; Herspring did not intentionally place appellant's photograph in the number two position. Herspring did not tell them that appellant had been arrested for the shooting. Rachel identified appellant's photograph as the shooter. Fabiola said appellant's photograph "looks like" the shooter. Luis said that photographs in the number two and four positions "looked similar" to the shooter. Fabiola and Luis "subsequently qualified their response[s]." Although Herspring wanted to conduct a live lineup, it did not occur.

**III. Defense Evidence**

Appellant's former girlfriend, Monica Yrigollen, testified that on the night of the shooting, appellant was with her at her house watching Monday Night Football on television. During the game, Monica left the house to go to the store and drove past the market. Monica saw two police cars, an ambulance and a small crowd as she drove by. A friend named "Leticia" accompanied Monica to the store. Monica returned to the house and told appellant that "[s]omething had happened" at the market.

It was stipulated that on the evening of the shooting, there was a Monday night football game between the St. Louis Rams and the Philadelphia Eagles starting at 6:00 p.m. and ending sometime after 9:00.

William Shomer testified as an expert on the reliability of eyewitness identification of strangers in criminal cases. He opined that the largest source of erroneous convictions in the United States is honest but mistaken witness identification. Shomer opined that an in-person identification of a suspect made while the suspect is in court, after the witness has already seen the suspect's photograph in a

...

lineup, is improperly suggestive and unreliable. Shomer opined that People's exhibit No. 33 is improperly suggestive because appellant's photograph was placed in position number two and this is the position upon which an eyewitness will naturally focus. Also, appellant's photo has a different color background than the other photographs and the size of his head in the photograph is smaller than all but one of the other heads in the lineup. Shomer opined that the photographic lineup was conducted improperly. Herspring held the photographs in such a manner that he was effectively pointing to appellant's photograph. Also, the lineup should have been conducted by an officer who was not related to the case.

(Lod. Doc. 4 at 3-10.)

**DISCUSSION**

**I.   Jurisdiction**

A person in custody pursuant to a state court judgment may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution and Petitioner's custody arose from a conviction in the Madera County Superior Court. As this judicial district encompasses Madera County, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus. *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a state court convicted and sentenced the petitioner if the state "contains two or more Federal judicial districts").

**II.  AEDPA Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions. *See Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1))*, overruled in part on other grounds*, *Hayward v. Marshall*,

603 F.3d 546, 555 (9th Cir. 2010) (en banc); *see Lockyer*, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. *See Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006) *overruled in part on other grounds*, *Hayward*, 603 F.3d at 555. As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id*. (quoting *Williams v. Taylor*, 529 U.S. at 412). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id*. Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id*. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

\\\

\\\

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue....This does not mean that Ninth Circuit caselaw is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. *Bailey v. Rae*, 339 F.3d 1107, 1112-13 (9th Cir. 2003). As the California Supreme Court's decision consisted of a summary denial, the Court looks through that decision to the last reasoned decision; namely, that of the California Court of Appeal. *See Nunnemaker*, 501 U.S. at 804.

\\\

**III.     Review of Petitioner's Claims**

The petition for writ of habeas corpus contains four grounds for relief.  In his first ground for relief, Petitioner contends that the prosecutor committed prosecutorial misconduct and violated Petitioner's right to confront witnesses against him.  Petitioner's second ground for relief alleges constitutional violations stemming from the testimony of a witness who was not on the prosecutor's final witness list.  Petitioner avers in his third ground for relief that his constitutional rights were violated by the admission of evidence regarding threats against a prosecution witness.  Lastly, Petitioner contends that trial court's failure to issue instructions for manslaughter and attempted manslaughter was erroneous.

*A.     Ground One: Prosecutorial Misconduct*

In his first ground for relief, Petitioner claims that the prosecutor committed misconduct during the cross examination of Petitioner's alibi witness, Monica Yrigollen, and closing arguments by acting as an unsworn witness in violation of Petitioner's constitutional rights.  (Pet. Att. A at a-e.) Specifically, Petitioner faults the prosecutor for asking Ms. Yrigollen about her mother's statements to investigating officers and for asserting during closing arguments that the story told by Ms. Yrigollen's mother was different from Ms. Yrigollen's own story and that Ms. Yrigollen was hiding her mother.

Respondent asserts that Petitioner's claim is procedurally defaulted.  A claim is considered procedurally defaulted where the state court invokes a state procedural rule, which is adequate to support the judgment and independent of federal law, to reject a federal claim.  *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991).  A state procedural rule is adequate if the rule is sufficiently clear at the time of the default.  *Ford v. Georgia*, 498 U.S. 411, 423 (1991). Additionally, the rule must be "firmly established and regularly followed" by the state court in order to constitute an adequate procedural bar.  *Id*. at 424-25 (finding that rule announced at time of procedural default is not firmly established); *see Wood v. Hall*, 130 F.3d 373, 377 (9th Cir. 1997) (stating that a rule is inadequate where the rule is selectively applied, ambiguous, or unsettled in the state and is not inadequate merely because the rule entails the exercise of judicial discretion); *see also Hill v. Roe*, 321 F.3d 787, 790 (9th Cir. 2003).  A procedural rule is independent if it is not

1   "interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *see Morales*
2   *v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) (quoting *Coleman*, 501 U.S. at 735 (quoting *Long*,
3   463 U.S. at 1041)) ("[f]ederal habeas review is not barred if the state decision 'fairly appears to rest
4   primarily on federal law, or to be interwoven with the federal law'").

5      "[P]rocedural default does not bar consideration of a federal claim on either direct or habeas
6   review unless the last state court rendering a judgment in the case 'clearly and expressly' states that
7   its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quoting
8   *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)). The fact that the State court went on to reach the
9   merits of the case does not erase the procedural bar. *See id*. at 264 n.10 (stating "a state court need
10  not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the
11  adequate and independent state ground doctrine requires the federal court to honor a state holding
12  that is a sufficient basis for the state court's judgment, even when the state court also relies on federal
13  law."). Here, the California Court of Appeal clearly and expressly invoked the contemporaneous
14  objection rule, finding that Petitioner's "claim that the prosecutor engaged in a pattern of misconduct
15  whereby he acted as an unsworn witness was waived." (Lod. Doc. 4 at 16.) The appellate court
16  noted that an objection on the grounds of prosecutorial misconduct was never raised to any of the
17  statements as defense counsel failed to object to any of the prosecutor's statements during closing
18  and only raised hearsay objections to the prosecutor's questioning of the alibi witness. (Id. at 15.)
19  Petitioner contends that the state court's factual finding is not binding as it is unreasonable. (Pet'r's
20  Traverse at 17.) Petitioner's argument is unavailing as the record illustrates that counsel did not raise
21  the proper objection to the prosecutor's cross examination of the alibi witness. (RT at 4319.)

22     As procedural default is an affirmative defense, Respondent bears the burden of pleading and
23  proving that the state procedural bar is adequate and independent while Petitioner bears the interim
24  burden of placing the adequacy of the defense at issue. *Bennett v. Mueller*, 322 F.3d 573, 585 (9th
25  Cir. 2003). At question here is California's requirement that the defendant make a contemporaneous
26  objection at trial in order to preserve the issue at appeal. *See Melendez v. Pliler*, 288 F.3d 1120,
27  1125 (9th Cir. 2002) (noting that rule set forth in California Evidence Code section 353 is "known as
28  the 'contemporaneous objection rule,' evidence is admissible unless there is an objection, the

grounds for the objection are clearly expressed, and the objection is made at the time the evidence is introduced"). As Respondent correctly asserts, the Ninth Circuit has recognized that California's contemporaneous objection rule is applied independently of federal law. *See Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999) (recognizing and applying California's contemporaneous objection rule in affirming denial of a federal petition on the ground of procedural default); *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (sustaining state court's finding of procedural default where defendant failed to make any objection at trial). Additionally, the Ninth Circuit has found that California courts have consistently applied the contemporaneous objection rule. *Melendez*, 288 F.3d at 1125 (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)); *Vansickel*, 166 F.3d at 957; *Bonin*, 59 F.3d at 842 (sustaining state court's finding of procedural default where defendant failed to make any objection at trial). Therefore, the Court finds that Respondent has met the burden of pleading and proving the procedural bar is adequate and independent.

The burden now shifts to Petitioner to place the adequacy of the rule into question as "the scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner." *Bennett*, 322 F.3d at 584-85. Here, Petitioner's only argument against the invocation of the procedural bar on this claim was that the state court's findings of fact was objectively unreasonable. For the reasons stated above, the Court finds this argument unsupported by the record. Thus, Petitioner has failed to satisfy his interim burden under *Bennett*. The Court finds that the procedural rule rests on an adequate and independent state procedural ground. Consequently, federal habeas review of Petitioner's claim is barred unless Petitioner can demonstrate cause and actual prejudice or that failure to review Petitioner's claims is necessary to avoiding a miscarriage of justice. *Coleman*, 501 U.S. at 725.

"'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (finding cause is established by ineffective assistance of counsel but that principles underlying exhaustion requires that the ineffective assistance of counsel claim be raised to state court) (hereinafter "*Murray*"); *see Stickler v. Greene*, 527 U.S. 263, 283 n. 24 (1999) (finding cause where the failure

1  to raise a claim resulted from conduct attributable to the prosecutor that impeded trial counsel's
2  access to the factual basis for the claim); *see also McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991)
3  (finding that objective factors that may constitute cause include interference by officials that would
4  make assertion of the claim impracticable, a showing that the factual or legal basis for the claim was
5  not reasonably available, or constitutionally ineffective assistance of counsel under the Sixth
6  Amendment). Here, Petitioner has not shown any cause for his procedural default.[5] As Petitioner
7  has not established cause, the Court need not consider whether Petitioner can demonstrate that he
8  would be prejudiced by the procedural default. *McCleskey*, 499 U.S. at 502 (citing *Murray*, 477 U.S.
9  at 494); *see also Smith v. Murray*, 477 U.S. 527, 533-34 (1986) (noting that the court need not
10 determine whether a petitioner had suffered prejudice as it was "self-evident" that the petition had
11 not demonstrated cause); *see also Cook v. Schriro*, 538 F.3d 1000, 1028 n.13 (9th Cir. 2008) (citing
12 to *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982) for the proposition that a court need not consider
13 whether a petitioner suffered actual prejudice where the petitioner cannot show cause).

14        Even if Petitioner had established cause for his procedural default, the Court finds that
15 Petitioner cannot establish prejudice from the prosecutor's comments. To establish actual prejudice,
16 Petitioner must establish "not merely that the errors at his trial constituted a possibility of prejudice,
17 but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of
18 constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (quoted in *Murray v.
19 Carrier*, 477 U.S. at 494). A claim that Petitioner was actually prejudiced at trial by the prosecutor's
20 alleged misconduct fails in light of the trial court's curative instructions, which instructed the jury
21 that:

22     Nothing that the attorneys say is evidence. In their opening statements and closing
       arguments the attorneys discuss the case, but their remarks are not evidence. The
23     attorneys' questions are significant only if they helped you to understand the witness'
       answers. Do not assume that something is true just because one of the attorneys
24     asked a question that suggested it was true.

25 (RT at 4515.) A court "must presume that the jury followed those instructions." *United States v.

---

27     [5]Petitioner does not contend ineffective assistance of trial counsel as cause for his failure to object at trial to the
28 prosecutor's statement; rather, Petitioner's vague assertions regarding trial counsel's alleged deficiency is confined to the
   section challenging hearsay testimony regarding threats to a witness. (Pet. Att. A at C3.)

*Awad*, 551 F.3d 930, 940 (9th Cir. 2009); *see Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) (plurality opinion); *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (stating that, "[t]he rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process"). Consequently, the Court finds that Petitioner suffered no actual prejudice.

Similarly, Petitioner has failed to establish that a miscarriage of justice would result from applying the procedural bar to Petitioner's case. "Even if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of [a defaulted claim] if the failure to hear the claim[s] would constitute a 'miscarriage of justice.'" *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *see also Schlup v. Delo*, 513 U.S. 298, 321 (1995) (reiterating exception for fundamental miscarriage of justice but noting that exception is explicitly tied to petitioner's innocence). Thus, "[t]o qualify for the 'fundamental miscarriage of justice' exception to the procedural default rule, however, [Petitioner] must show that a constitutional violation has 'probably resulted' in the conviction when he was 'actually innocent' of the offense." *Cook*, 538 F.3d at 1028 (quoting *Murray*, 477 U.S. at 496); *see also Gandarela v. Johnson*, 286 F.3d 1080, 1085 (9th Cir. 2002) (finding that a petitioner must establish factual innocence to show that a fundamental miscarriage of justice would result from application of a procedural default). Petitioner has provided no basis upon which the Court could conclude he is factually innocent of the crimes. Indeed, the Court finds such a conclusion untenable in light of the "overwhelming" evidence produced at trial against Petitioner. (*See* Lod. Doc. 4 at 16) (noting that four different witnesses, including a member of the same gang as Petitioner, identified Petitioner as the shooter and that there was corroborating evidence of Petitioner's guilt and the eye witness' testimony). Consequently, the Court does not find that a miscarriage of justice would result from the applying a procedural default to Petitioner's case.

In sum, federal habeas review of Petitioner's first ground for relief is barred as the claim has been procedurally defaulted.

\\\

\\\

### B.     Ground Two: Refusal to Bar Testimony of Witness

Petitioner's second ground for relief centers around violations of his constitutional rights arising from the testimony of Valerie Salinas. (Pet. Att. A at i-vii.) Specifically, Petitioner alleges the prosecutor committed misconduct in failing to put Ms. Salinas on the witness list. Petitioner further alleges that his constitutional rights were violated when the trial court ignored Ms. Salinas' assertion of her constitutional right against self-incrimination. Additionally, Petitioner contends that the trial court's refusal to bar Ms. Salinas' testimony was erroneous under state law and deprived him of his federal constitutional right to due process of the law.

Respondent contends that these claims are also procedurally defaulted under California's contemporaneous objection rule. To the extent Petitioner is claiming prosecutorial misconduct (Pet. Att. A at iv), the California Court of Appeal clearly and expressly found the prosecutorial misconduct claim was waived under California contemporaneous objection rule. (Lod. Doc. 4 at 22-23.) Similarly, the appellate court found that any argument regarding the trial court's handling of Ms. Salinas' invocation of her Fifth Amendment rights were also waived. (Id. at 23-24.) As noted above, California's contemporaneous objection rule is adequate and independent.

Petitioner has failed to establish cause for failing to object on the grounds that the prosecutor committed misconduct or to raise any objections to the trial court's handling of Ms. Salinas' invocation of the Fifth Amendment.[6] Assuming *arguendo* that Petitioner had established cause, Petitioner has not established actual prejudice stemming from the testimony of Ms. Salinas. By the prosecutor's own admission, and the trial court's observation, the prosecutor's handling of Ms. Salinas "hurt" the prosecutor. (RT at 3502-03.) After the conclusion of Ms. Salinas' testimony, the trial court concluded that, "[a]t this point she hasn't said anything one way or the other except that she remembers nothing . . . I don't see any prejudice to the defense case from her testifying and not having been on the witness list." (Id. at 3503.) The trial court's reasoning was based in part on the fact that defense counsel had been provided discovery regarding Ms. Salinas prior to trial. An

---

[6] On direct appeal, Petitioner argued that counsel was ineffective in not objecting to the trial court's handling of Ms. Salinas' invocation of her Fifth Amendment rights. However, Petitioner presents no such argument in either his petition or his traverse. Thus, the Court will not consider an ineffective assistance of counsel argument in considering whether Petitioner had cause for his procedural default.

examination of the trial record leads the Court to the same conclusion reached by the California Court of Appeal; namely that no prejudice resulted to Petitioner from Ms. Salinas' testimony. Ms. Salinas testified that she could not remember whether Mr. Maciel or Petitioner were at her home on the day of the shooting. (Id. at 3489.) Furthermore, Ms. Salinas admitted that she had lied to Detective Herspring when she told him that Petitioner had been at her home that day. (Id. at 3490-91.) More importantly, as the trial court noted, the overwhelming theme of Ms. Salinas' testimony was that she did not remember anything, a fact she reiterated numerous times during her testimony. (Id. at 3490-91, 3496-98.) Lastly, for the same reasons stated in the preceding section, the Court does not find that a fundamental miscarriage of justice would occur from applying the procedural default to his case. Thus, federal habeas corpus review of Petitioner's claims, regarding prosecutorial misconduct by not putting Ms. Salinas' name on the final witness list and the trial court's handling of Ms. Salinas' assertion of her right against self incrimination, is barred by procedural default.

However, the Court finds that Petitioner's argument, that the trial court abused its discretion and erred in permitting Ms. Salinas to testify, is not procedurally barred as the California Court of Appeal clearly did not rest its adjudication of this matter on procedural grounds. The Court initially notes that the "[f]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). As the Supreme Court in *Estelle* noted, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 67-68. Consequently, "[a] state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). Here, Petitioner contends that the trial court's refusal to strike Ms. Salinas' testimony deprived him of a fundamentally fair trial. (Pet. Att. A at i.) As noted in the preceding paragraph however, Petitioner cannot establish the requisite level of prejudice for a due process violation as he was not actually

prejudiced by the admission of Ms. Salinas' testimony.

In sum, the Court finds that Petitioner's claims of prosecutorial misconduct and trial court's erroneous handling of Fifth Amendment assertion is procedurally defaulted and Petitioner's due process claim fails on the merits.

### C. Ground Three: Hearsay Evidence Regarding Contract

In this ground for relief, Petitioner alleges that California Evidence Code section 352, the rules against hearsay and irrelevant evidence were violated by the admission that there was a contract out to kill a witness, Mr. Maciel, for testifying at Petitioner's trial.[7]

At trial, both Mr. Maciel and the prosecution's gang expert testified regarding threats to Mr. Maciel's life. Mr. Maciel testified on redirect that he had heard rumors that there were guys out to get him. (RT at 2801-02.) Agent Jason Dilbeck, the prosecution's gang expert, testified that the Norteño gang viewed Mr. Maciel as a traitor for having testified and that there was a "green light for Mr. Maciel, which would mean his name is in the hat to be violently assaulted or killed by either members of the Norteño Criminal Street Gang or members that had done some type of violation against the bonds that wanted to get back into the good graces of the Norteño Criminal Street Gang." (Id. at 3997-98.) Agent Dilbeck further testified that he had personal knowledge of a green light out on Mr. Maciel. (Id. at 3998.)

Respondent asserts that Petitioner's claim is barred as he procedurally defaulted this claim. The California Court of Appeal found that this claim was waived, stating that:

> It is a well established principle of jurisprudence that only points that were raised and ruled on in the trial court are considerable on appeal. ([Cal.] Evid.Code, § 353; *People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13, 22 Cal.Rptr.2d 689, 857 P.2d 1099.) To preserve an evidentiary issue for review, timely objection must have been interposed on the same ground during trial. ( [*People* v. *Navarette* (2003) 30 Cal.4th 458, 491]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014-1015, 30 Cal.Rptr.2d 818, 874 P.2d 248.) "Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence. [Citations.]" ( *People v. Mattson* (1990) 50 Cal.3d 826, 854, 268 Cal.Rptr. 802, 789 P.2d 983.) In this case, defense counsel did not object on the ground of hearsay or interpose an excessive prejudice objection pursuant to Evidence Code section 352. Defense counsel did not argue that admission

---

[7]Petitioner also contends that the admission of this evidence violated Federal Rule of Evidence 801(c). The Court finds this contention is wholly without merit as Petitioner's trial was before a state court. Federal Rules of Evidence are not binding and do not apply to state courts.

of testimony on the subject of possible retaliation against Jaime infringed any of appellant's constitutional rights. Defendant did not object on any ground to Dilbeck's testimony that he had personal knowledge there was a "green light" on Jaime. Therefore, the hearsay and excessive prejudice claims were not preserved for appellate review.

(Lod. Doc. 4 at 29-30.)

The Court finds the statements by the California Court of Appeal to be an express and clear invocation of California's contemporaneous objection rule. Similar to the previous two grounds for relief, Petitioner does not challenge the independence or adequacy of this rule. While Petitioner's traverse fails to address the issue of cause, the petition alleges ineffective assistance of counsel for failure to raise those objections. (Pet. Att. A at C3; Pet'r's Traverse at 23-24.) Ineffective assistance of counsel would satisfy the cause prong. *See McCleskey*, 499 U.S. at 493-94 (quoting *Murray*, 477 U.S. at 488) ("constitutionally '[i]neffective assistance of counsel ... is cause.'"). Assuming *arguendo* that this constitutes sufficient cause for the procedural default,[8] Petitioner has failed to demonstrate prejudice or a fundamental miscarriage of justice would result from applying the procedural default. Contrary to Petitioner's assertion otherwise, the evidence that the Norteño gang might have a "green light" on the witness did not render Petitioner's trial fundamentally unfair as there was never any implication that Petitioner was behind the "green light." Rather, as noted by the appellate court, this evidence pertained solely to Mr. Maciel's credibility. The Court is further convinced that no actual prejudice occurred to Petitioner as defense counsel challenged the probative value of the "green light" evidence on Mr. Maciel's credibility, eliciting from Agent Dilbeck on cross examination the fact that Mr. Maciel had been in danger from the time he was an active gang member and that Mr. Maciel continued to participate in Norteño gang activities after he became an

---

[8] The California Court of Appeal seemingly suggested that Petitioner's assertion of ineffective assistance of counsel was itself procedurally defaulted for two reasons, namely Petitioner had failed to develop the claim and a claim of ineffective assistance of counsel is properly brought in a petition for writ of habeas corpus to the state court. (Lod. Doc. 4 at 30-31.) A procedurally defaulted ineffective assistance of counsel claim "can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000). Procedural default is an affirmative defense. Here, Respondent fails to argue that the claim is procedurally defaulted; rather, Respondent raises the affirmative defense of failure to exhaust state remedies with regards to the ineffective assistance of counsel claim.

informant knowing he was subjecting himself to danger.[9] (RT at 4000-01.) In light of this record, the Court does not find that Petitioner suffered actual prejudice from the admission of this evidence. Consequently, Petitioner's third ground for relief is procedurally defaulted and federal habeas corpus review is barred for this claim.

### D.     Ground Four: Instructional Error

In his last ground for relief, Petitioner contends that his right to due process of the law was violated when the trial court failed to *sua sponte* issue instructions for the lesser included offenses of manslaughter and attempted manslaughter. (Pet. Att. A at x-xi.)

Respondent correctly notes that this claim is unexhausted as Petitioner never raised this claim to the California Supreme Court. (Resp't Answer at 30.) The petition for review that Petitioner submitted to the California Supreme Court listed three claims–prosecutorial misconduct, trial court's refusal to bar Ms. Salinas' testimony, and the admission of "green light" evidence. (*See* Lod. Doc. 6 at 3-13.) None of those three claims encompass this instructional error claim.

A habeas petitioner must exhaust his state remedies in order to obtain habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A) (stating, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that...the applicant has exhausted the remedies available in the courts of the State"). The exhaustion of state remedies requires habeas petitioners to fairly present all claims to "each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (noting that fair presentation requires that the claim itself alert the state court of the federal nature of the claim); *Duncan v. Henry*, 513 U.S. 364, 365(1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) in stating, "exhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights'"). Here, Petitioner failed to present this claim in any form to the California Supreme Court; thus, Petitioner

---

[9]Petitioner's ineffective assistance of counsel claim fails on the merits as Petitioner cannot establish that he suffered actual prejudice stemming from the admission of this evidence. *See* Strickland v. Washington, 466 U.S. 668, 687(1984) (claims predicated on the deprivation of a defendant's Sixth Amendment rights generally require a showing of both deficient performance and prejudice).

has failed to exhaust his claim and may not obtain habeas corpus relief on this ground.

\\\

Alternatively, the Court denies Petitioner's claim on the merits. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). A state court's failure to instruct on a lesser included offense is generally not cognizable in a federal habeas proceeding. *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (citing *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998)). More importantly, the Court finds that there was not substantial evidence to support the lesser included offense such that the trial court bore a *sua sponte* duty to issue instructions for manslaughter and attempted manslaughter. *See id.* at 929 (denying federal habeas relief where California Court of Appeal found the evidence to support lesser-included offenses was not substantial). Here, multiple witnesses testified that Petitioner fired after the victims professed their apologies and/or surrendered. (RT at 2745-49, 3064, 3435, 3469.) The witnesses further testified that Petitioner fired at Roberto, who fell, before Petitioner then shot at Luis, who was attempting to escape from the gun fire. (Id. at 2750-54, 3068-69, 3395-97, 3474-75.) Witnesses testified that Petitioner fired seven to eight shots at the two victims. (Id. at 2750-54, 3398). The record clearly establishes that a manslaughter instruction was clearly not warranted by the evidence. Thus, Petitioner has failed to state a cognizable claim of instructional error and cannot obtain habeas corpus relief on this ground.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O' Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to

Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     August 27, 2010**             /s/ John M. Dixon
                                         UNITED STATES MAGISTRATE JUDGE

U.S. District Court
E. D. California

20